**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF SOUTH CAROLINA**

KEVIN SMITH, a/k/a Bar-None, Royal Blackness #164920,

Plaintiff,

Civil Action No. 0:04-1819-PMD-BM

JON OZMINT, DIRECTOR OF THE SOUTH CAROLINA DEPARTMENT OF CORRECTIONS, ET.AL,

Defendants.

**REPORT AND RECOMMENDATION**

This action has been filed by the Plaintiff, pro se, alleging violations of his constitutional rights as well as the Religious Land Use and Institutionalized Persons Act (RLUIPA). Plaintiff also asserts state law claims for defamation, assault and battery, and under various state statutes.

On July 31, 2006, all Defendants except for the Defendant Medley filed a motion for summary judgment pursuant to Rule 56, Fed.R.Civ.P. Because the Plaintiff is proceeding pro se, a Roseboro order was entered by the Court on August 2, 2006, advising Plaintiff of the importance of a motion for summary judgment and of the need for him to file an adequate response. Plaintiff was specifically advised that if he failed to respond adequately, the Defendants' motion may be granted, thereby ending his case. The Defendant Medley subsequently filed his own motion for summary judgment on October 24, 2006, following which a second Roseboro order was entered on





October 25, 2006. By order filed November 28, 2006, Plaintiff was allowed to view certain video tapes in the possession of the Defendants, and was granted an extension until December 22, 2006 to file a memorandum in opposition to the Defendants' pending dispositive motions. Plaintiff filed a memorandum in opposition to summary judgment the following day, November 29, 2006, together with voluminous exhibits, but did not file any other response prior to the December 22 deadline. Plaintiff did, however, submit an "affidavit" relating to the videotapes on January 10, 2007, and another affidavit dealing with the inmate barber on January 12, 2007. Defendants' motions are now before the Court for disposition.[1]

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. The moving party has the burden of proving that judgment on the pleadings is appropriate. Once the moving party makes this showing, however, the opposing party must respond to the motion with "specific facts showing there is a genuine issue for trial." Rule 56(e), Fed.R.Civ.P. Further, while the Federal Court is charged with liberally construing a complaint filed by a pro se litigant to allow the development of a potentially meritorious case, see Cruz v. Beto, 405 U.S. 319 (1972); Haines v. Kerner, 404 U.S. 519 (1972), the requirement of liberal construction does not mean that the Court can ignore a clear failure in the pleadings to allege facts which set forth a Federal claim, nor can the Court assume the existence of

---

[1]This case was automatically referred to the undersigned United States Magistrate Judge for all pretrial proceedings pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(d) and (e), D.S.C. The Defendants have filed motions for summary judgment. As these are dispositive motions, this Report and Recommendation is entered for review by the Court.





a genuine issue of material fact where none exists. Weller v. Dep't of Social Services, 901 F.2d 387 (4th Cir. 1990).

**Discussion**

Plaintiff, a frequent filer of litigation in this Court,[2] filed his 304 page Complaint (including exhibits) on June 23, 2004, naming forty-three (43) Defendants. Plaintiff sues each Defendant for defamation of character, assault and battery, improper use of physical restraints and/or excessive use of force, improper deprivations of incoming publications and/or correspondence, denial of the right to possess photographs, inadequate ventilation and water in his cell, improper food service, improper confiscation and/or destruction of personal and legal property, other alleged unconstitutional conditions of confinement such as no mirrors in his cell and not having a clock in his cell, improper investigations and/or processing of grievances, improper restrictions on his visitation rights, violation of his religious freedoms and the RLUIPA, violations of his rights during disciplinary hearings, as well as corresponding violations of numerous state statutes and laws. See generally, Complaint, pp. 4-9. Plaintiff seeks monetary damages, including punitive damages, as well as certain injunctive or declaratory relief.

In support of his allegations, Plaintiff has submitted hundreds of pages of exhibits. Videotapes have also been received and reviewed by the Court. The undersigned has sifted through this mass of material and pleadings in an effort to address Plaintiff's many and varied complaints, at least to the extent that they constitute federal claims, and have discussed these complaints hereinbelow.

---

[2]Although Plaintiff is "struck out" under the so-called "three strikes rule" of 28 U.S.C. § 1915(g), he paid the full filing fee in this case. Therefore, his Complaint was filed and served.





Defendants have also made arguments for other defenses, such as no respondeat superior liability and no allegations of wrongdoing by particular defendants with respect to particular claims, which, because of the findings set forth hereinbelow on the merits of Plaintiff's underlying claims, have not been separately discussed.

**I.**

**(Prison Grooming Policy)**

The SCDC has a grooming policy which requires inmates to maintain a haircut no longer than one inch in length and prohibiting beards. See Defendants' Exhibit A ["Inmate Grooming Standards"]. Plaintiff claims that he is a practicing Rastafarian, that his religion forbids the cutting of hair, and alleges in his Complaint that the Defendants are forcibly grooming him and giving him haircuts in violation of his freedom of religion. This claim is without merit.

To the extent Plaintiff is making a constitutional claim against the SCDC grooming policy, this Court may take judicial notice that prison grooming policies have previously been upheld by the courts on constitutional grounds, including specifically the grooming policy of the South Carolina Department of Corrections. See Hines v. South Carolina Department of Corrections, 148 F.3d 353, 357-358 (4th Cir. 1998) [upholding former SCDC grooming policy];[3] Caprood v. Moore, C/A No. 98-603 (D.S.C. May 27, 1999), aff'd No. 99-6792, 1999 WL 651848 (4th Cir. Aug. 26, 1999) (table) [finding forced haircuts constitutional]; Roberts v. Ozmint, No. 05-2324, 2006 WL 2303183 at *1 (D.S.C. Aug. 8, 2006) [finding forced haircuts under current SCDC

[3]The SCDC grooming policy formerly provided that inmates who refused haircuts were not forcibly shaven, but were instead placed in the Special Management Unit (SMU). That policy has now been changed. Under the current policy, all prisoners are required to have their hair cut with no alternative being provided. Ward Affidavit, ¶ 2; see also, Defendants' Exhibit A.





policy do not violate First Amendment exercise of rights]; see also Nicholas v. Ozmint, No. 05-3472, 2006 WL 2711852 at *4 (D.S.C. Sept. 20, 2006) [denying request for TRO based on South Carolina's current grooming policy]. See Hunter v. Moore, No. 97-7032, 1998 WL 792223 (4th Cir. Nov. 16, 1998), cert. denied, 526 U.S. 1071 (1999); *cf.* Abordo v. State of Hawaii, 902 F.Supp. 1220, 1225 (D.Hawaii 1995) ["neither the prison's grooming standards nor the memorandum regarding enforcement of the grooming policy creates a protected liberty interest"]; Hall v. Bellmon, 935 F.2d 1106, 1114 (10th Cir. 1991) [prison intake facility's policy of cutting inmates' hair does not violate free exercise of religion as it related to legitimate penological interests: preventing inmates from hiding weapons in their hair]; DeBlasio v. Johnson, 128 F.Supp.2d 315 (E.D.Va. 2000), aff'd, 2001 WL 721398 (4th Cir. 2001). See Aloe Creme Laboratories, Inc. v. Francine Co., 425 F.2d 1295, 1296 (5th Cir. 1970) [This Court may take judicial notice of its own records.].

Plaintiff's argument that the use of inmate barbers to give these haircuts violates his constitutional rights is also without merit. It is a common practice in prisons to have inmate barbers. See generally, Young v. Larkin, 871 F.supp. 772, 781 (M.D.Pa. 1994) [inmate barbers used to give haircuts], aff'd, 47 F.3d 1163 (3rd Cir. 1995); Onishea v. Hopper, 171 F.3d 1289, 1292 (11th Cir. 1999) [referencing job as inmate barber]; Anderson v. Romero, 72 F.3d 518, 525 (7th Cir. 1995) [discussing inmate barber being warned about another inmate being HIV positive]; Iron Eyes v. Henry, 909 F.2d 810, 812 (8th Cir. 1990) [discussing forced haircut given by inmate barber]. If this practice violates some SCDC prison policy or state law or regulation, he may pursue this claim in a state administrative or judicial forum. Such a policy does not, however, in general give rise to a





federal constitutional claim.[4] *Cf.* LaBranch v. Terhune, 192 Fed.Appx. 653 (9th Cir. 2006) [noting that prisoner's claim that prison was allowing unlicensed barbers to cut the hair of inmates was a state law claim], cert. denied, 127 S.Ct. 710 (2006); Small v. Cole, No. 04-180, 2005 WL 2219269 at *4 (N.D. Tex. Sept. 7, 2005) [noting that Plaintiff's claim that an inmate should not be allowed to perform barber functions alone does not rise to a constitutional violation.].

To the extent Plaintiff is instead claiming that the SCDC grooming policy violates his religious freedoms under the RLUIPA, he is still not entitled to the relief he seeks. The RLUIPA provides that no government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution unless the government demonstrates that imposition of the burden on that person 1) is in furtherance of a compelling governmental interest, and 2) is the least restrictive means of furthering that compelling governmental interest. See 2 U.S.C. § 2000cc-1(a); Cutter v. Wilkinson, 544 U.S. 709, 714 (2005). Defendants also note that for the RLUIPA to even be applicable to the SCDC grooming policy, that policy must either receive federal financial assistance or affect interstate of foreign commerce. 42 U.S.C. § 2000cc-1(b); see Ephraim v. Angelone, 313 F.Supp.2d 569, 575 (E.D.Va. 2003), aff'd, 2003 WL 21480621 (4th Cir. 2003) [Plaintiff has the burden of showing that the challenged program or activity receives federal financial assistance or affects interstate or foreign commerce].

Defendants argue that Plaintiff has submitted no evidence whatsoever to show that the SCDC grooming policy satisfies either of these two threshold requirements, and that therefore

[4]The use of inmate barbers by prison officials could be part of a specific excessive use of force claim. *Cf.* Toles v. Young, No. 00-210, 2002 WL 32591568, at * 7 (W.D.Va. March 6, 2002) [Summary judgment granted where plaintiff failed to show any serious injury as a result of the inmate barber cutting his hair or shaving his beard], aff'd, 55 Fed.Appx. 152 (4th Cir. 2003). Plaintiff's excessive use of force claims are discussed separately herein, infra.





any claim Plaintiff is asserting under the RLUIPA should be dismissed. While the undersigned agrees with the Defendants that Plaintiff has pointed to no evidence to show, or to give rise to a genuine issue of fact as to whether, the RLUIPA is applicable to the SCDC grooming policy[5], even if Plaintiff's claim is considered on the merits, it is subject to summary judgment.

The Fourth Circuit Court of Appeals has already found in Hines that the SCDC grooming policy serves a compelling penological interest, while describing the effect it has on prisoners as "incidental". Hines, 148 F.3d at 358. Although Hines involved a constitutional challenge to the SCDC's prior grooming policy, and was also not evaluated under the "strict scrutiny" standard of the RLUIPA, the fact remains that the Fourth Circuit in Hines concluded that the Department of Corrections had a "compelling" penological interest in preventing inmates from wearing long hair and beards. See also Ward Affidavit (previously submitted). Therefore, the policy meets the first prong of the RLUIPA two-prong test. Numerous other court rulings have also found that grooming regulations, including the forced cutting of hair, meet the "least restrictive means" criteria (the second prong of the RLUIPA two-prong test), even under a "strict scrutiny" analysis. See Clark v. Briley, No. 03-3852, 2005 WL 2369330 at *2-4 (N.D.Ill. Sept. 26, 2005) [finding that

[5]Even though Rule 56 does not impose upon the District Court a duty to sift through the record in search of evidence to support a litigant's arguments on summary judgment; Forsyth v. Barr, 19 F.3d 1527, 1537 (5th Cir. 1994), cert. denied, 115 S.Ct. 195 (1994); Malina v. Baltimore Gas & Elec., 18 F.Supp.2d 596, 604 (D.Md. 1998); Hayes v. North State Law Enforcement Officers Ass'n, 10 F.3d 207, 215 (4th Cir. 1993), cert. denied sub nom, Price v. City of Charlotte, 420 U.S. 1116 (1997); as previously noted, the undersigned has attempted to cull through Plaintiff's exhibits in a general effort to find or locate evidence which might possibly support his claims. The undersigned has found no specific exhibits or evidence in this review which would support a finding that the SCDC grooming policy either receives federal financial assistance or affects interstate or foreign commerce. Nevertheless, the Supreme Court in Cutter did comment that "[e]very State...accepts federal funding for its prisons". Cutter, 544 U.S. at 715-714, n. 4. Therefore, in light of Plaintiff's pro se status, and for purposes of summary judgment only, the undersigned has proceeded to discuss Plaintiff's RLUIPA claim on the merits.





forcing inmate to submit to a haircut was the least restrictive means of meeting the safety and security concerns at the prison]; Hoevenaar v. Lazaroff, 422 F.3d 366 (6th Cir. 2005); Brunskill v. Boyd, 141 Fed.Appx. 771, 775 (11th Cir. 2005). *Cf.* Hamilton v. Schriro, 74 F.3d 1545, 1555 (8th Cir. 1996) [claim evaluated under old Religious Freedom Restoration Act (RFRA)]; Harris v. Chapman, 97 F.3d 499, 504 (11th Cir. 1996); Diaz v. Collins, 114 F.3d 69, 73 (5th Cir. 1997) [same]; *cf.* Daker v. Washington, __ F.Supp.2d ___, 2007 WL 92502 (N.D. Ga. Jan. 16, 2007) [finding shaving policy was least restrictive means and did not violate RLUIPA].

Plaintiff correctly notes that the prison policy upheld by the Fourth Circuit in Hines was different from the current grooming policy, and that under the SCDC's current policy, all prisoners may have to have their hair cut with no alternative being provided. See Ward Affidavit, ¶ 2.[6] This policy change does not, however, entitle Plaintiff to relief. The policy still serves the "compelling" governmental interest found in Hines, and there is no evidence of any other least restrictive means which could be employed to meet this compelling interest. Hamilton v. Schriro, 74 F.3d 1545, 1555 (8th Cir. 1996) [noting that hair length regulations serve compelling interests of safety and security and that there was no viable, less restrictive means of addressing those interests]; Daker, 2007 WL 92502.

Several reasons have been cited by the Defendants as to why the "less restrictive means" attempted by the SCDC was not viable, and for no longer allowing inmates to reside in the SMU/MSU[7] with long hair and/or beards. First, the old policy exacerbated problems the SCDC was

---

[6] As previously noted, under the old policy, prisoners were not forcibly shaven; rather, inmates who refused to comply with the grooming policy were placed in the prison SMU.

[7] Some of the evidence refers to the Maximum Security Unit (MSU), instead of the Special Management Unit (SMU), although these two units may be one and the same. Ward defines the





having with shortage of space in SMUs, the units where inmates who pose security risks and threats to the safety of other inmates and staff are kept. The change in policy serves the purpose of making additional cell space available in SMU units to inmates who pose security threats and/or are guilty of major disciplinary violations, instead of to inmates who are simply opposed to the SCDC grooming standards in order to grow their hair. Defendants have also submitted evidence that inmates who wanted to be in the SMU for reasons other than a religious objection to the grooming policy, such as avoiding work assignments or in order to obtain a single cell, could choose not to cut their hair. Defendants also point out that housing inmates in the SMU requires additional manpower, leading to personnel and staffing problems. Finally, Defendants point out that the danger posed by inmates having long hair and beards is the same, whether are not they are in the SMU, which dangers were among the original penological reasons for not allowing long hair in the first place. See generally, Ward Affidavit, ¶¶ 4-10.

Plaintiff has failed to submit evidence sufficient to give rise to a genuine issue of material fact as to whether the Defendants' grooming policy, even as currently constituted, violates the RLUIPA. The Supreme Court in Cutter specifically pointed out that accommodating prisoners' religious beliefs, including under the strict scrutiny standard of the RLUIPA, does not override other significant interests, giving particular sensitivity to security concerns. Cutter, 544 U.S. at 709 ["Lawmakers supporting RLUIPA were mindful of the urgency of discipline, order, safety, and security in penal institutions and anticipated that courts would apply the Act's standard with due deference to prison administrator's experience and expertise."]; Murphy v. Mo. Dep't of

---

SMU as "a specialized housing unit for inmates who pose security risks and threats to the safety of inmates and staff." Ward Affidavit, ¶ 4.





Corrections, 372 F.3d 979, 987 (8th Cir. 2004) [Same deference given to the expertise of prison officials under Religious Freedom Restoration Act ("RFRA") applies to RLUIPA].[8] Such is the case here. Clark, 2005 WL 2369330 at *3 ["Under..[RFRA's] analogous compelling interest standard, prison hair length regulations have been routinely found to be related to security considerations."]; Hamilton, 74 F.3d at 1555 [noting that hair length regulations serve compelling interests of safety and security and that there was no viable, less restrictive means of addressing those interests]; Diaz, 114 F.3d at 73 [grooming policies serve compelling state interest which would not meaningfully be achieved by any different or lesser means]; *cf.* Green v. Ozmint, et al.,C/A No. 2:04-22074-22AJ (order of the Honorable Cameron McGowan Currie, United States District Judge, filed March 16, 2005, at pp. 8-15).

Therefore, to the extent Plaintiff is making a general challenge to the SCDC's grooming policy as part of the claims in his Complaint, that claim is without merit and should be dismissed.

**II.**

**(Claims of Excessive Use of Force)**

While Plaintiff generally discusses in his Complaint how he is subjected to excessive force and restraints by correctional officers, his primary reference is to two specific incidents: one occurring on November 9, 2002, and the other occurring on August 13, 2003. See generally,

[8]See Hoevenaar, 422 F.3d at 368 ["RLUIPA is similar to the Religious Freedom Restoration Act of 1993 (RFRA) in that the court must determine whether the plaintiff is likely to succeed in demonstrating that the regulation in issue imposes a substantial burden on his religious exercise. Assuming the plaintiff makes this initial showing, the court next considers whether the regulations meet strict scrutiny, i.e., the regulation must be 'the least restrictive means' towards furthering 'a compelling government interest.' [citations omitted] Again, this test is the same as that previously imposed under RFRA."].





Plaintiff's Complaint, allegations beginning on pages 20, 59, and 81. Both of these incidents involve Plaintiff being physically restrained and given a haircut.

When reviewing allegations of excessive force, the Court must consider 1) the need for the application of force, 2) the relationship between the need and the amount of force that was used, 3) the threat to the staff and inmates as reasonably perceived by the prison officials on the basis of the facts known to them, 4) the efforts made to temper the severity of a forceful response, and 5) the extent of the injuries suffered by the prisoner. Whitley v. Albers, 475 U.S. 312, 321 (1986). See Hudson v. McMillian, 503 U.S. 1, 7 (1992) [the core judicial inquiry is whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm]; see also United States v. Cobb, 905 F.2d 784 (4th Cir. 1990), cert. denied, 498 U.S. 1049 (1991); Taylor v. McDuffie, 155 F.3d 479 (4th Cir. 1998); Norman v. Taylor, 25 F.3d 1259, 1263 (4th Cir. 1994); Fuentes v. Wagner, 206 F.3d 335, 342 (3d Cir. 2000); Wilson v. Williams, 83 F.3d 870, 873 (7th Cir. 1996) [applied to pretrial detainee]; Thomas v. Sawyer, No. 97-2475, 1999 WL 155704 at *3 (N.D.Tex. Mar. 11, 1999); Moore v. Martinez County Jail, No. 98-731, 1998 WL 602113 at *2 (N.D.Cal. Sept. 4, 1998). After careful review and consideration of the evidence submitted with respect to this claim, the undersigned does not find that a genuine issue of fact has been presented as to whether Plaintiff was subjected to excessive use of force on either of these two occasions.

Plaintiff claims that during the incident of August 13, 2003 he was already in restraints when prison guards, in full riot gear, told him that if he refused to receive a haircut that force would be used against him. Plaintiff alleges that he told the Major (Christiansen) that he was not refusing to receive a haircut, but that the force team nevertheless entered his cell and assaulted





him even though he was in handcuffs, and during which he was sprayed with mace. Plaintiff alleges he was then dragged to the barber shop, where his head was shaved, all while his eyes were burning and his breathing was restricted because of the gas. Plaintiff alleges that he was not allowed to wash off the hazardous chemical agents prior to his head being shaved, and that as a result of this incident he suffered permanent facial tissue damage and scars, respirational complications, damage to his eyes, and other injuries.

With respect to the incident of November 9, 2002, Plaintiff alleges that prison guards came to his cell for the purpose of escorting him to get a haircut, but that he told them that, due to his Rastifarian beliefs, he did not want a haircut. Plaintiff alleges that a force team then entered his cell, at which time he was "physically pounced upon by prison guards", and that even after the application of mechanical restraints, he was "repeatedly rammed in the side of [his] neck, back, [and] face". Plaintiff alleges that the Defendants were intentionally trying to break his arms and hurt his right eye and that he was repeatedly choked during this confrontation. Plaintiff alleges that after he was removed from his cell he was "punched/hit" by the prison guards, and that his head was rammed against the wall. Plaintiff alleges that even after he was placed in the barber's chair, he was repeatedly choked by prison guards. Plaintiff alleges that after this incident, he was in severe pain and could barely walk and stand up straight as a result of the beating and the handcuffs and leg shackles being placed on too tightly. Plaintiff was escorted to the MSU medical room, where he was seen by Nurse Murphy, where he alleges Murphy attempted to "coverup [his] severe injuries".

In support of this claim, Plaintiff has submitted a copy of an affidavit from fellow inmate Bobby Thompson, who attests that on November 9, 2002 Plaintiff was "attacked" and forcibly taken to the inmate barber. Thompson attests that members of the force team "continued





to punch and hit [Plaintiff] after he was bound and chained and being escorted to the barber chair." See Plaintiff's Exhibit O. Inmate Sanyika Askari has also submitted an affidavit, wherein he attests that on November 9, 2002 he witnessed prison guards trying to talk Plaintiff into going to get his haircut, but that Plaintiff refused on religious grounds. Askari confirms that Plaintiff was told that, if he did not comply, he would be forcibly taken to get a haircut. Askari attests that he witnessed the prison guards "repeatedly ramming [Plaintiff's] head into the wall, poking at his eyes with their hands, punching and kicking him in his body, slapping him several times hard across the face, and then holding him down face first in scalding hot water while in mechanical restraints." Plaintiff's Exhibit O. Other prisoner affidavits also discuss these two incidents, and claim that Plaintiff was mistreated. See generally, Plaintiff's Exhibits (Court Document No. 235-2).

In support of summary judgment on this claim, the Defendants have also submitted several exhibits. Dr. Glenn Alewine, a licensed physician, attests in an affidavit that he has reviewed Plaintiff's medical records from November 9, 2002 and August 13, 2003, which do not reveal any significant or serious injuries suffered by the Plaintiff as a result of these incidents. Alewine attests that Plaintiff was even rechecked by medical and provided with an x-ray, which failed to reveal any quantifiable evidence of any physical abnormality. Alewine attests that Plaintiff's medical records from August 13, 2003, referencing the incident where some type of chemical munitions were used, specifically show that following this incident Plaintiff's lungs were clear and that there were no signs of breathing problems. Plaintiff was provided with a bandaid for a wrist abrasion and was instructed to shower well and rinse his eyes. Physical examinations on August 14, 2003 and August 28, 2003 revealed no quantifyable physical evidence of any injury to





Plaintiff's eyes. Plaintiff even received and optometric examination, which showed no abnormalities. See generally, Alewine Affidavit.

Bernard McKie, Warden of the Kirkland Correctional Institution (where Plaintiff was housed), attests in an affidavit that Plaintiff was forcibly removed from his cell on November 9, 2002 after refusing to comply with orders. McKie attests that Plaintiff had prepared for this event by wrapping his head and face in clothing, covering the floor with soap and water, throwing a brown liquid at the extraction team, and cutting one of the officers (Officer Hayes) with a piece of metal. McKie attests that with respect to the incident of August 13, 2003, Plaintiff had been placed into a recreational cell prior to requiring him to comply with the grooming policy in an attempt to isolate him from any weapons, such as the "shank" that had been used to assault Officer Hayes in November 2002, and also to prevent him from flooding his cell with water and covering the cell with soap. McKie attests that when Plaintiff refused to comply with their orders the cell extraction team entered the recreation area and utilized the minimum amount of force necessary to restrain Plaintiff and verify that his restraints were intact. McKie attests that when an inmate refuses to comply with orders, a cell extraction team must treat him as if he was not restrained until such time as the restraints can be checked and verified. McKie attests that Plaintiff was then walked to the restraint chair, where he was restrained and his hair was cut. Plaintiff was then provided with a medical examination and returned to confinement.

The Defendants have also provided affidavits from Joel Kircher and Harold Scott concerning the incident of November 9, 2002, which support the affidavits of McKie and Alewine. Copies of the use of force form and other prison documents relating to this incident, as well as the incident of August 13, 2003, are attached to these affidavits as exhibits.





Finally, the undersigned has personally reviewed the two videotapes relating to these incidents. The videotape of November 9, 2002 shows Plaintiff being asked to comply with the grooming policy, and Plaintiff's refusal to do so. The tape appears to reflect that Plaintiff's cell had been flooded, as water can be seen coming out from underneath his cell door. The tape shows the force team entering the cell and restraining and shackling the Plaintiff. Plaintiff resisted the force teams efforts. No blows or punches by force team members are seen on the videotape, nor is there any evidence on the tape of "scalding water" being used on the Plaintiff. The tape further reflects that, while the inmate barber was cutting his hair, Plaintiff told the inmate barber he was going to "get him in the yard."

The tape shows that Plaintiff was then seen by Nurse Murphy at the nurse's station, during which Plaintiff complains about pain in his back, neck, and wrist. Nurse Murphy said that she did not see any swelling, but told Plaintiff that she would get him something for his pain. Nurse Murphy noted that Plaintiff had good circulation, even though he was still shackled. Once Plaintiff was back in his cell, Plaintiff complained that the nurse had not done enough for him, although she did provide him with medication, cleaned a cut with an antiseptic, and provided him with an ice pack.

With respect to the tape of the incident of August 13, 2003, this tape shows Plaintiff in what apparently is a recreation area, being asked if he would submit to have a haircut. Plaintiff appears to already be in handcuffs at that time. Contrary to Plaintiff's statement in his affidavit, he does not state that he will comply with the force team's request. The force team is then shown entering the recreation area/cell and subduing the Plaintiff, during which time he was apparently sprayed with some type of chemical munition. After Plaintiff is surrounded and restrained, the tape





shows Plaintiff complaining about the chemical munition and not being able to breathe, while officers pat him on his back and tell him to "cough it up". The tape also shows the officers repeatedly wiping Plaintiff's eyes and face with water and a wet rag.

After Plaintiff gets his haircut, he is walked back to his cell. Plaintiff continues to complain that he can't breathe and that his eyes are "messed up". He is examined by a male nurse, no problems are noted, and he is taken back to his cell. The tape generally reflects that Plaintiff spends most of his time taunting officers and complaining, but he does not appear to be in any serious distress.

In his "affidavit" filed with the Court on January 10, 2007, Plaintiff denies having thrown a cup of brown liquid/human waste at any member of the cell extraction team on November 9, 2002, or striking Officer Hayes with a long metal shank. Plaintiff states that the videotape of this incident (which Plaintiff was allowed to review as part of the discovery in this case) does not show either of these events, and the undersigned was not able to see any such conduct on the videotape. Plaintiff notes that at the end of the videotape of November 9, 2002, Major Latta states that no employee was injured. Plaintiff also complains that the angle of the videotape often does not show everything that is going on, but that he can be heard complaining on the tape about his leg shackles cutting into this ankles and about his head being banged against the wall.

As for the August 13, 2003 videotape, Plaintiff claims that this tape "has been altered", and also complains that the camera view is often blocked by members of the cell extraction team. Plaintiff states that he can be heard on the tape prior to the extraction team entering his cell stating that he wasn't looking for any trouble. Plaintiff also talks about how the August 13 videotape shows him coughing and choking because of the use of chemical munitions. Plaintiff





complains that his eyes and face were not "flushed" in accordance with proper procedure, and that approximately 35 minutes elapsed before his eyes were decontaminated.

After careful review and consideration of this evidence and the exhibits submitted to this Court, the undersigned finds and concludes that no genuine issue of fact as to whether Plaintiff's constitutional rights were violated during these incidents has been presented. In contrast to many such claims presented to this Court, in this case we actually have videotape evidence regarding what occurred during the two incidents in question. While the videotapes certainly show that force was used against the Plaintiff on both occasions, and indeed accurately and in often times graphic detail demonstrate the harshness of prison life, neither the videotapes or the medical evidence presented to this Court show that any named Defendant was deliberately indifferent to a serious medical need of the Plaintiff, or that any named official acted with a sufficiently culpable state of mind to engage in conduct harmful to the Plaintiff. See generally, Strickler v. Waters, 989 F.2d 1375, 1379 (4th Cir. 1993) [in order to establish a constitutional claim, an inmate must show not only a sufficiently serious deprivation of a basic human need, but that the offending official engaged in the alleged adverse conduct with a sufficiently culpable state of mind]; Hudson, 503 U.S. at 7 [the core judicial inquiry is whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm]. The mere fact that Plaintiff had to be physically restrained does not mean that Plaintiff's constitutional rights were violated. Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973) ["not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights"].

It goes without saying that any use of force against a prison inmate is regrettable. However, the fact remains that Plaintiff refused to comply with lawful and proper requests from the





prison guards to submit to a haircut. While Plaintiff has provided some affidavits from other inmates concerning the incidents of physical force against the Plaintiff [see Waters Affidavit, Docket No. 235-2, pp. 2-3; Thompson Affidavit, No.235-2, p. 4; Askari Affidavit, No. 235-2, pp. 31-33; Allah Affidavit, No. 235-2, pp. 34-35; Hudson Affidavit, No. 235-2, pp. 36-37; Corey Affidavit, No. 235-2, pp. 38-39; Lindsey Affidavit, No. 235-2, p. 40], the videotape and other evidence submitted in this case does not show excessive force was used, as in both incidents there was clearly a need for the application of force, the amount of force used was minimal, a threat to the staff and inmates could reasonably have been perceived by prison officials on the basis of the facts known to them, and there is no evidence of any serious injuries suffered by the Plaintiff as a result. Whitley, 575 U.S. at 521; Norman v. Taylor, 25 F.3d at 1263 [absent the most extraordinary circumstances, a plaintiff cannot prevail on an Eighth Amendment claim if his injury de minimis]. There was no way for the Defendants to know how the Plaintiff would react when they came into physical contact with him, nor was there any way for the Defendants to know whether Plaintiff possessed a weapon. In light of Plaintiff's conduct and refusal to obey direct orders of the correctional officers, the amount of force used was not sufficient to give rise to a constitutional claim. Plaintiff cannot engage in conduct which is in defiance of prison rules and regulations, refuse to obey direct orders of prison guards as to his movements, and then complain when those prison guards use physical force against him to secure the situation, particularly (as was the case in November 2002) when Plaintiff is in no restraints and the prison guards had no way of knowing what actions Plaintiff would take when they attempted to restrain him, as long as the amount of force used was not excessive. The evidence does not show excessive force was used under the circumstances. See Farmer v. Brennan, 114 S.Ct. 1970, 1979 (1994) [A defendant must have





engaged in conduct "for the very purpose of causing harm or with the knowledge that harm [would] result"]; Pruitt v. Moore, No. 02-395, 2003 WL 23851094 at *9 (D.S.C. July 7, 2003) [only deliberate or callous indifference on the part of prison officials to a specific known risk of harm states on Eighth Amendment claim], cert. denied, 2004 WL 232748 (4th Cir. 2004); Levy v. State of Ill. Dept. of Corrections, No. 96-4705, 1997 WL 112833 (N.D.Ill. March 11, 1997) ["A defendant acts with deliberate indifference only if he or she 'knows of and disregards' an excessive risk to inmate health or safety.'"]; see also Shakka v. Smith, 71 F.3d 162,166 (4th Cir. 1995) [in order to state a constitutional violation, the deprivation alleged must not only be "objectively significantly serious", but the Defendant must also have acted with a "sufficiently culpable state of mind"]; Stanley v. Hejirika, 134 F.3d 629, 634 (4th Cir. 1998), (citing Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996)); see Thaddeus-X v. Wozniak, No. 99-1720, 2000 WL 712383 at **3 (6th Cir. May 23, 2000)[Plaintiff must show he suffered more than de minimis injury]; Harper v. Showers, 174 F.3d 716, 719 (5th Cir. 1999)[Without proof of more than de minimis physical injury, Plaintiff cannot maintain his claim].

In making the finding set forth hereinabove, the undersigned does not intend to minimize Plaintiff's complaint that the Defendants should not have used a chemical munition against him when he was restrained. However, in looking at the totality of the circumstances, no constitutional violation has been shown. See Bailey v. Turner, 736 F.2d 963, 969 (4th Cir. 1984); Williams v. Benjamin, 77 F.3d at 763. Plaintiff had a history of violence and forcibly resisting haircuts, he had refused to comply with Defendants' request that he submit to a haircut, the amount of mace used was small (2.1 grams of CS Mace), and, according to the incident reports filed by the participating officers, the amount of force used was in "accordance with the Use of Force





Continuum."[9] See Exhibits - Report on Use of Force dated August 13, 2003, signed by James Christensen; Report of Use of Force dated August 13, 2003, signed by E. Reardon; see also Plaintiff's Exhibit E-4 (Court Document No. 238-7). The fact that pepper spray or mace was used during this incident does not mandate that Plaintiff's claim go forward, as the use of mace, tear gas or pepper spray by prison officials is not a per se violation of a prisoner's constitutional rights when used appropriately. Williams, 77 F.3d at 763; Norris v. District of Columbia, 614 F.Supp. 294 (D.D.C. 1985), aff'd, 787 F.2d 675 (D.C.Cir. 1986); Peterson v. Davis, 551 F.Supp. 137 (D.Md. 1982), aff'd without op., 729 F.2d 1453 (4th Cir. 1984); O'Connor v. Keller, 510 F.Supp. 1359 (D.Md. 1981); Brock v. Robinson, 378 F.Supp. 1263 (W.D.Pa. 1974); Collins v. Schoonfield, 363 F.Supp. 1152 (D.Md. 1973); Davis v. United States, 316 F.Supp. 80 (E.D.Mo. 1970), aff'd 439 F.2d 1118 (8th Cir. 1971); Williams v. Dehay, Nos. 94-7114, 94-7115, 1996 WL 128422 **2-3 (4th Cir. March 21, 1996). Here, the Defendants have provided evidence to show why the use of force was necessary on that occasion, the videotape clearly shows prison guards assisting Plaintiff and cleaning off his eyes and face immediately after use of the chemical spray, and the evidence reflects that no serious injury was incurred.

Hence, while Plaintiff may have some state law claim with regard to the conduct of the Defendants, or some further administrative remedy he could pursue, the undersigned does not find that Plaintiff has submitted sufficient evidence to raise a genuine question as to whether the amount of force used violated his *constitutional rights*. Daniels v. Williams, 474 U.S. 327, 328-336 (1986) [noting that jailers may owe a special duty of care to those in their custody under state court

---

[9] See also, n. 13, infra.





law, but rejecting the contention that the constitution embraces such a tort law concept]. Plaintiff should pursue this claim, if at all, in state court.

**III.**

**(Visitation, Mailings, and Photographs)**

Plaintiff also alleges that he is being denied his constitutional right to freedom of association because he is not allowed to receive visits from friends, family members (including specifically family members under the age of 18) or from "female companions". Plaintiff complains that, as an inmate in the SMU, he has not been allowed to see any of his nieces, nephews, or cousins, that he can no longer see an aunt that he used to be able to see, and that he would also like to see his "girlfriends". Plaintiff also complains that he is not allowed to have photographs of family members and loved ones in his cell, nor is he allowed to receive incoming publications such as books, magazines and newsletters. Plaintiff alleges that these conditions of confinement have caused him to suffer from extreme emotional distress and mental anguish, and that his grievances concerning these issues have either been denied or ignored.

In support of summary judgment on these claims, the Defendants point to McKie's affidavit, wherein he attests that the restriction on possession of personal photographs by inmates in the MSU is a privilege restriction which encourages inmates to comply with institutional rules so that they may be discharged from the MSU back into the general inmate population. McKie Affidavit, ¶ 39. McKie attests that restrictions on photographs also reduces the time required for staff to individually review incoming photographs to prevent the introduction of sexually explicit photographs, photographs depicting gang signs and activity, and other materials that reduce institutional security and threaten the rehabilitation of inmates. With respect to publications, McKie





attests that inmates in maximum security who have existing subscription publications when they are assigned to the MSU are typically allowed to continue to receive the publication for the remainder of the subscription, but are not permitted to renew the publication once the subscription expires. MSU inmates are also not permitted to subscribe to any periodicals, regardless of content or topic, while housed in maximum security, a restriction which serves a legitimate penological purpose by encouraging inmates to comply with institutional rules in order to be discharged from the MSU back into the general inmate population. McKie does point out, however, that inmates are allowed to maintain a primary source book for their religion, such as a Koran or a Bible, while other religious publications can be provided through the inmate chaplain from donated materials upon written request. McKie Affidavit, ¶¶ 37-38.

The Defendants also note that many of the publications Plaintiff discusses in his Complaint are "adult" magazines. McKie attests that inmates are expressly prohibited from receiving or possessing any materials that contain sexually explicit photographs, as such materials tend to decrease institutional security and create potential conflicts among inmates, and also tend to become a currency of sorts that can be used by inmates for the procurement of favors, such as assaults on other inmates, or contraband, such as drugs and weapons. These types of materials can also incite fights among inmates over damage to such materials. McKie attests that through the denial of magazines and other types of publications, prison officials also are seeking to deny inmate access to materials containing gang signs or information, methods for fabricating weapons or escape implements, as well as correspondence depicting or describing gang activities, all of which pose a serious threat to institutional security. McKie Affidavit, ¶¶ 40-42.





McKie attests that the restrictions on visitors to maximum security inmates serves to reduce the number of visitors to the facility, thereby reducing the potential security concerns and the number of guards necessary to staff the facility. McKie further notes that minors must be more closely monitored to prevent them from being victimized by inmates or, in the case of a breach of security, becoming a hostage in the facility, while the restrictions on visitation in general also serve as an incentive for inmates to comply with institutional rules so that they can be released from maximum security and returned to the general inmate population. McKie Affidavit, ¶ 36.

The undersigned agrees with the Defendants that Plaintiff has failed to set forth a constitutional claim with respect to these allegations. There is no absolute right to prison visitation, and restrictions on Plaintiff's visitation privileges under the facts presented do not amount to any violation of the Plaintiff's constitutional rights. White v. Keller, 438 F.Supp. 110, 114-115 (D.Md. 1977); see also Kentucky Dep't of Corrections v. Thompson, 490 U.S. 454, 461 (1989) [denial of prison access to a particular visitor does not set forth a constitutional claim]; Overton v. Bazzetta, 539 U.S. 126, 134 (2003) [Restricting visitation privileges "is a proper and even necessary management technique to induce compliance with the rules of inmate behavior, especially for high-security prisoners who have few other privileges to lose"]. While Plaintiff could have possibly stated a claim if he had presented some evidence to show that the *reason* his visitation privileges where restricted was due to a prohibited criteria, such as a religious bias; see Abdulhaseeb v. Saffle, 65 Fed.Appx. 667, 675 (10th Cir. 2003); he has presented no *evidence* whatsoever to support such a claim. *Cf.* Chapman v. City of Detroit, 808 F.2d 459, 465 (6th Cir. 1986) [conclusory allegations of discrimination without any supporting evidence are not sufficient to establish liability] (race case); Jaffe v. Federal Reserve Bank of Chicago, 586 F.Supp. 106, 109 (N.D.Ill. 1984) [a plaintiff





"cannot merely invoke his [religion] in the course of the claim's narrative and automatically be entitled to pursue relief"].

As for Plaintiff being denied the right to have photographs in his cell, even of family members, as well as being prohibited receipt of magazines, newsletters, or similar materials, this complaint also fails to state a claim of constitutional magnitude. It is well settled that the placement of inmates into administrative segregation units or similar units is a valid means of minimizing a "threat to security of the institution, threat to the safety of other residents or Jail staff, etc." Jackson v. Bostick, 760 F.Supp. 524, 528 (D.Md. 1991). See also Hewitt v. Helms, 459 U.S. 460, 468 (1983); Anderson v. County of Kern, 45 F.3d 1310, 1312 (9th Cir. 1995); Montanye v. Haymes, 427 U.S. 236, 242 (1976) [if a prisoner's confinement is within terms of the sentence imposed upon him and does not violate other constitutional provisions, "the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight"]. Prison officials are given wide ranging deference with respect to custody conditions for such inmates; Anderson, 45 F.3d at 1316 [Prison officials have legitimate penological interests in Administrative Segregation, and they must be given "wide-ranging deference" with respect to their need to maintain order, discipline, and "institutional security"], reh'd denied, 75 F.3d 448 (9th Cir. 1995), cert. denied, County of Kern v. Anderson, 116 S.Ct. 306 (1995); and unless Plaintiff has presented evidence sufficient to create a genuine issue of fact as to whether any of the policies complained of in his Complaint amount to a constitutional violation when considered under these standards, summary judgment is appropriate. See generally Sweet v. South Carolina Department of Corrections, 529 F.2d 854, 859 (4th Cir. 1975) (en banc) [describing federal court's deference to prison administrators and all administrative matters unless the condition rises to the level of a constitutional violation]. He has failed to do so.





The MSU is where the worst inmates in the prison system are housed. In such an environment, restraints on an inmate's liberty and freedom of movement should be expected, as should other restrictions on the inmate's activities and privileges; *cf.* Daigre v. Maggio, 719 F.2d 1310, 1313 (5th Cir. 1983) ["[S]olitary confinement is a disciplinary measure whose very essence is the deprivation of interests the first amendment protects....To promote the important government interest in maintaining discipline, officials must have available sanctions that impose incremental disadvantages on those already imprisoned"]; and as long as restrictions or regulations placed on MSU inmates are reasonably related to a legitimate penalogical objective, they should be upheld by the courts. Turner v. Safley, 482 U.S. 78, 89 (1987) ["...when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penalogical interests"].

In order to determine if a regulation is "reasonably related to legitimate penalogical interests", courts look to whether the regulation is rationally related to a legitimate and neutral government objective, whether there are alternative avenues that remain open to the inmates to exercise the right, the impact that accommodating the asserted right would have on other guards and prisoners and on the allocation of prison resources, and whether the existence of easy and obvious alternatives indicates that the regulation is an exaggerated response by prison officials. Turner, 482 U.S. at 89-90. Significantly, the burden is on the prisoner to disprove the validity of the prison regulations at issue. Overton, 539 U.S. at 132. Here, Plaintiff has failed to show that the prison policies regarding receipt of magazines or other publications or photographs in his cell is not reasonably related to a legitimate penalogical interest under the standard of Turner and its progeny. With respect to these policies, as well as the general restrictions on visitation privileges Plaintiff





complains of, the Defendants' evidence reflects the motivations and rationale behind these policies. Plaintiff's own statements as to why he wants photographs in his cell reinforce Defendants' contention that the policy denying such photographs serves as a valid incentive for Plaintiff to modify his behavior to obtain release back to a less restrictive facility, where he would be allowed to possess the photographs he seeks. *Cf.* Vasquez v. Frank, No. 05-528, 2005 WL 2740894 at *12 (W.D.Wisc. 2005) ["[R]estrictions on a[n] inmate's receipt of...photographs as part of an incentive program were reasonably related to the prison's legitimate interest in promoting good behavior"], aff'd in part, vacated in part (on other grounds), 2006 WL 3623044 (7th Cir. Dec. 13, 2006). The same is true for magazines and other publications. See Ramirez v. McCaughtry, No. 04-335, 2005 WL 2010173 (W.D.Wisc. 2005) [upholding policy that restricted access to newspapers, magazines, and photographs to inmates in segregation as part of an incentive system for good behavior].

Indeed, the undersigned can take judicial notice that the specific policies at issue in this case have already been upheld by the courts of this District and Circuit. See Corey v. Reich, No. 02-2801, 2004 WL 3090234, aff'd, 2004 WL 1730327 (4th Cir. 2004), cert. denied, 544 U.S. 924 (2005); Incumaa v. Ozmint, C/A No. 0:03-2776-22BD; see also Beard v. Banks, 126 S.Ct. 2572 (2006) [system of suspension of privileges valid means of attempting to control behavior]; Daigre, 719 F.2d at 1313 ["To promote the important government interest in maintaining discipline, officials must have available sanctions that impose incremental disadvantages on those already in prison. Left free to write to anyone in the world and to receive literature of any kind, a prisoner might find punitive isolation desirable, offering solitude and leisure as an alternative to the ordinary conditions of prison work and life. Thus, a narrower restriction on first amendment interests would likely prove ineffective in maintaining discipline"]; Gregory v. Auger, 768 F.2d 287, 290 (8th Cir. 1985)





[restrictions on certain types of correspondence, including junk mail, newspapers and magazines serve a legitimate penalogical objective of "deterrence of future infractions of prison rules"].[10]

Plaintiff must realize that, by virtue of his own actions which have resulted in his imprisonment and incarceration in administrative segregation, he has given up many of the rights and privileges enjoyed by inmates in the general prison population. Most of the lost privileges of which he now complains are part of the prison system's incentive program to try and get him to alter his behavior so that he can return to the general population. Considering this standard, and with respect to Plaintiff's particular grievances here, courts have repeatedly held that it is not unreasonable for a prison to restrict the amount of material inmates in administrative segregation may have in their cells at any one time. Maberry v. McKune, 24 F.Supp.2d 1222, 1228-1229 (D.Kan. 1998) [Regulation which imposed quantity and value limitations on property which inmates were allowed to possess did not violate equal protection or due process]; Savko v. Rollins, 749 F.Supp. 1403, 1409 (D.Md. 1990) [Limitation on the amount of in-cell religious reading material contained in prison regulation is constitutional under Turner standards]; see In re Long Term Administrative Segregation of Inmates Designated as Five Percenters, 174 F.3d 464, 469 (4th Cir. 1999) ["Prison officials 'should be accorded wide-ranging deference in adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security'"] (quoting Bell v. Wolfish, 441 U.S. 520, 547 (1979)); Overton, 539 U.S. at 132 ["We must accord substantial deference to the professional judgment of prison administrators, who bear significant responsibility for defining the legitimate goals of a corrections

---

[10]The undersigned also notes that the evidence specifically shows that, notwithstanding these restrictions, Plaintiff has literature made available to him on a regular basis, as well as religious materials and access to legal materials. See McKie Affidavit.





system and for determining the most appropriate means to accomplish them"]. These claims are therefore without merit.

**IV.**

**(Complaints About Prison Grievance Process)**

Plaintiff makes several allegations in his Complaint regarding the prison grievance process. Plaintiff claims that the Defendants are biased against him, do not properly handle his grievances, and that he is therefore unable to obtain relief through the prison grievance process. As attachments to his Complaint as well as his memorandum opposing summary judgment, Plaintiff has attached numerous copies of grievances he has filed with the prison system as well as responses he has received to these grievances.

Of course, one of Defendants' arguments for dismissal of this case is that Plaintiff has failed to exhaust his remedies under the prison grievance process. Pursuant to § 1997e(a), "[n]o action shall be brought with respect to prison conditions[11] under section 1983 of this Title, or any other federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." Through the enactment of this statute,

---

[11] There is no definition for the term "prison conditions" contained in § 1997e. The Sixth Circuit utilizes a definition derived from 18 U.S.C. § 3262:

> [T]he term "civil action with respect to prison conditions" means any civil proceeding arising under federal law with respect to the conditions of confinement or the effects of actions by government officials on the lives of persons confined in prison, but does not include habeas corpus proceedings challenging the fact or duration of confinement in prison.

Id. § 3626(g)(2). *See also* Hartsfield v. Vidor, 199 F.3d 305, 308 (6th Cir. 1999); Neal v. Goord, 267 F.3d 116, 2001 WL 1178293 (2d Cir., Oct 04, 2001) (quoting Lawrence v. Goord, 238 F.3d 182, 185 (2d Cir. 2001) (*per curiam*)).





"Congress has mandated exhaustion clearly enough, regardless of the relief offered through administrative procedures." Booth v. Churner, 532 U.S. 731, 741 (2001); *see* Porter v. Nussle, 534 U.S. 516 (2002); Jones v. Smith, 266 F.3d 399 (6th Cir. 2001) [exhaustion required even though plaintiff claimed futility]; Larkin v. Galloway, 266 F.3d 718 (7th Cir. 2001) [exhaustion required even though plaintiff claimed he was afraid]; see also Claybrooks v. Newsome, No. 00-7079, 2001 WL 1089548 (4th Cir. Sept. 18, 2001) (unpublished opinion) [applying Booth v. Churner to affirm district court's denial of relief to plaintiff]. Accordingly, Defendants are correct that, before Plaintiff may proceed with his claims in this Court, he must first have exhausted his administrative remedies through the prison grievance process.[12]

The Fourth Circuit has held, however, that the Defendants have the burden of showing that Plaintiff failed to exhaust his administrative remedies. See Anderson v. XYZ Correctional Health Services, Inc., 407 F.3d 674, 683 (4th Cir. 2005) [inmate's failure to exhaust administrative remedies is an affirmative defense to be both pled and proven by the Defendant]. Here, given the large number of grievances filed by the Plaintiff, the confusing and convoluted state of his file and the nature and manner of responses to these grievances, and in particular Plaintiff's claim that the Defendants have refused to even properly process his grievances, the undersigned has herein, for purposes of summary judgment, addressed Plaintiff's underlying claims on the merits. See discussion, infra and supra. Nevertheless, with respect to Plaintiff's complaints solely

---

[12] In orders filed on May 9, 1996, this Court certified that the inmate grievance procedure established by the South Carolina Department of Corrections met the standards required by 42 U.S.C. § 1997e(a)(2). *See* the orders filed in Misc. No. 3:96-MC-83-2 and Misc. No. 3:96-MC-84-2 (D.S.C., May 9, 1996), which incorporate by reference SCDC PS-10.01 (May 1, 1996). Requiring Plaintiff to proceed in the SCDC administrative process before pursuing any federal remedies he may have provides him with an opportunity to prevail within the SCDC system that will be lost if the federal court proceeds without requiring that state remedies be exhausted.





concerning the operation of the grievance system itself, as opposed to the substantive claims contained in his grievances, that is not a claim cognizable under 42 U.S.C. § 1983, since there is no constitutional right to access to a prison grievance procedure. See Adams v. Rice, 40 F.3d 72 (4th Cir. 1994); Flick v. Alba, 932 F.2d 728, 729 (8th Cir. 1991); Buckley v. Barlow, 997 F.2d 494, 495 (8th Cir. 1993) [existence of a prison grievance procedure does not confer any substantive right upon inmates]; Brown v. Dodson, 863 F.Supp. 284 (W.D.Va. 1994) [inmates do not have a constitutionally protected right to a grievance procedure]; Azeez v. DeRobertis, 568 F.Supp. 8, 10 (N.D.Ill. 1982) [even where a state elects to provide a grievance mechanism, violations of its procedures do not deprive prisoners of federal constitutional rights. Therefore, a state's failure to follow its grievance procedures does not give rise to a § 1983 claim]; Spencer v. Moore, 638 F.Supp. 315, 316 (E.D.Mo. 1986) [holding that an inmate grievance procedure is not constitutionally required]; see also McGuire v. Forr, No. 94-6884, 1996 WL 131130, at *1 (E.D.Pa. March 21, 1996), aff'd, 101 F.3d 691 (3d Cir. 1996) [creation of a grievance system by a state does not create any federal constitutional rights, as prisoners are not constitutionally entitled to a grievance procedure]; Moore v. Sergent, No. 01-1271, 2001 WL 1355298 (6th Cir. Oct. 26, 2001); *cf.* Sprouse v. Babcock, 870 F.2d 450, 452 (8th Cir. 1989) [prison officials may place reasonable limits on prisoner's access to grievance procedure].

Therefore, any such claim is subject to dismissal. Plaintiff should instead pursue this matter through the state administrative or court system.





## V.

## (Due Process Concerns)

Plaintiff alleges that as a result of the incident of August 13, 2003, he was charged with Offense 2.13, refusing or failing to obey orders. Plaintiff alleges that he was notified of this charge on August 21, 2003, and spoke with a counsel substitute (Ms. Hill). Plaintiff also submitted a written request to staff member form on August 26, 2003, in which he requested that fellow prisoners Al-Maqauir Allah, Kevin Hudson, Tim Corey, and Roy Lindsey be present at his disciplinary hearing, which was scheduled for August 27, 2003, and that he also submitted affidavits from those prisoners refuting the allegations of MSU prison guard Kenneth Jones that he had refused to obey orders to leave the recreation area on August 13.

Plaintiff alleges that Hill failed to interview these prisoners, and that the affidavits were not read into the record at his disciplinary hearing, both in violation of SCDC policy. Plaintiff further alleges that if witnesses' testimony is to be denied, written reasons must be included on the disciplinary report and hearing record, but that the hearing officer (Lester Hinson) did not provide him any form of written reasons why Plaintiff was not allowed to call witnesses at his hearing, nor were any reasons included on the hearing report or record. Plaintiff alleges that all of these actions denied him due process. See generally, Complaint, pp. 54-57.

Although neither Plaintiff nor the Defendants have offered detailed arguments on this particular claim in their summary judgment memoranda, exhibits have been submitted to the Court showing that, as a result of Plaintiff's refusal to submit to a haircut on August 13, 2003, he was referred for a disciplinary hearing on the charge of refusing to obey an order. See Incident Report dated August 13, 2003 signed by Lt. Kenneth Jones. A copy of the disciplinary report and hearing





record has also been provided, showing that Plaintiff was charged with a violation of Policy 2.13 [refusing to or failing to obey orders]. This document further reflects that Plaintiff was notified of these charges at 1:00 p.m. on August 21, 2003, and the boxes indicate that Plaintiff wanted his accuser present at the hearing and that he also wanted a counsel substitute. Where Plaintiff was supposed to sign for these requests, the document bears the notation "inmate refused to sign was given copy". The document then reflects the hearing was held on September 3, 2003 at 2:45, and that Plaintiff pleaded not guilty. The document bears the notation "no" for the questions of whether witnesses, documentation or evidence was excluded from the hearing. The record reflects that Plaintiff was found guilty, with the reasons for the hearing officer's findings being set forth as follows: "Based on testimony of Lt. Jones that inmate Smith refused to come off recreation [unintelligible] hearing officer finds inmate Smith guilty." Plaintiff was sentenced to a thirty day loss of good time. Id.

A written transcript of Plaintiff's disciplinary hearing has also been provided (Defendant's Exhibit C). This transcript reflects that Plaintiff was present at the hearing with his counsel substitute, as was his accuser, and that Plaintiff participated fully in the hearing. In fact, it is safe to say that Plaintiff did most of the talking during the hearing.[13] The hearing officer states that he has reviewed Plaintiff's witness statements and that they would be attached to the paperwork. See Plaintiff's Exhibits (Court Document No. 174-2, pp. 10-17). When asked by the Plaintiff why

---

[13]Most of the Plaintiff's conversations during the hearing dealt not with whether he refused an order, but with the use of force against him, including the use of a chemical munition. Plaintiff asks Officer Jones during the hearing what the procedure is when someone is already in restraints, and Officer Jones testified that "it could vary based on application of chemical munitions normally which will be done prior to any force cell movement team, and that's the normal procedure. On occasions people have not used, but that's the procedure normally they'll use chemical munitions prior to use of force movement teams." Defendants' Exhibit C, p. 7.





he did not read his witness statements into the recorder, the hearing officer responded "I read them myself." Defendants' Exhibit C, p. 10.

After review of this claim and the evidence submitted, it must initially be noted that Plaintiff's claim regarding his disciplinary hearing is barred by Heck v. Humphrey, 512 U.S. 477 (1994). Heck held, in pertinent part, that in order to recover damages for an allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence at issue has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determinations, or called into question by a federal court's issuance of a writ of habeas corpus. Heck, 512 U.S. at 486-487. Although Heck involved a conviction in a court of law, the holding in Heck is equally applicable to cases which implicate the validity of an internal prison disciplinary conviction and sanction that affects the length of an inmate's overall sentence, such as a sentence that includes a loss of good time credits. *Cf.* Edwards v. Balisok, 520 U.S. 641, 648 (1997) [prisoner cannot bring a § 1983 claim challenging a disciplinary proceeding resulting in a loss of good-time credits if the possible relief would necessarily imply the invalidity of the punishment imposed]; McClain v. Leisure, 192 Fed.Appx. 544, 548 (7th Cir. Aug. 28, 2006); Miller v. Edminsten, 161 Fed.Appx. 787, 789 (10th Cir. Jan. 6, 2006). DeWitt v. Wall, 121 Fed.Appx. 398 (1st Cir. 2004); Pierce v. Freeman, No. 95-7031, 1997 WL 467533 (4th Cir. 1997) [holding that a prisoner cannot proceed on a § 1983 claim challenging the validity of a disciplinary proceeding resulting in the deprivation of good-time credits]. Since the evidence before the Court clearly shows that the sanction imposed on the Plaintiff as a result of the disciplinary conviction at issue was a loss of thirty (30) days of good time credits, and since no





evidence has been presented to the Court to show that this conviction or penalty has been reversed, declared invalid, or called into question by the issuance of a writ of habeas corpus, this claim is barred by Heck.

Further, even if not barred by Heck, the evidence before the Court reflects that Plaintiff was provided with the minimal standard of due process required in such hearings. There is no evidence to show that Plaintiff was not provided with written notice of the charges, or provided the opportunity to have his accuser present at the hearing and to present his own testimony and evidence. The evidence further reflects that Plaintiff was provided with a copy of the final report and decision, which cited the evidence on which the Hearing Officer relied and the reasons for the action taken. See Wolff v. McDonnell, 418 U.S. 539, 563-576 (1974); Luna v. Pico, 356 F.3d 481, 487-488 (2d Cir. 2004) [noting that due process requirements are satisfied where a prisoner is given advance written notice of the charges, the right to participate in the hearing and a qualified right to call witnesses,[14] and provided with a written statement setting out the decision and the reasons

[14]With respect to Plaintiff's claim concerning his witnesses not being called at the hearing, even assuming Plaintiff is correct that the hearing officer is required to provide a written explanation as to why a prisoner's witnesses are not called, no constitutional violation has been shown. The record clearly reflects that the hearing officer accepted the statements from Plaintiff's witnesses, and that these statements were made a part of the record in the case. See Plaintiff's Exhibit (Court Document No. 174-2, pp. 10-17). The undersigned knows from previous prisoner disciplinary hearing cases that, due to security concerns, MSU inmates are rarely allowed to personally attend disciplinary hearings as witnesses. Further, even assuming for purposes of summary judgment that prison policy provides that a written explanation is to be given when witnesses are not allowed to personally appear, and that the hearing officer violated that policy in this case, in light of the fact that the hearing officer accepted and considered these inmates' written statements, no *constitutional* violation has been shown. See McGuinness v. Dubois, 75 F.3d 794, 797-800 (1st Cir. 1996) [No due process violation found where affidavits were considered at disciplinary hearing instead of live testimony, and noting that, to the extent a state law or policy was violated, that was a matter for state judicial review, and had no application to a § 1983 action claiming a deprivation of rights secured by the federal Constitution and laws]; *cf.* Paul v. Davis, 424 U.S. 693, 701 (1976) [not every claim which may set forth a cause of action under a state tort law is sufficient to set forth a claim for a





therefore]. The evidence before the Court does not reflect that any prison officials acted arbitrarily or capriciously in the handling of his case, as in an institutional setting the fact-finder need only show that some evidence existed to support the decision. Superintendent, Massachusetts Correction Institution v. Hill, 472 U.S. 445, 456-457 (1985); see Piggie v. Cotton, 344 F.3d 674, 677 (7th Cir. 2003). The Supreme Court in Superintendent evidenced a distaste for allowing the federal courts to review the outcome of prison disciplinary actions, and under the applicable caselaw a disciplinary decision is sufficient to pass scrutiny under the due process clause if it is supported by "some" evidence. Id; Baker v. Lyles, 904 F.2d 925 (4th Cir. 1990); Sales v. Murray, 862 F.Supp. 1511 (W.D.Va. 1994); McClung v. Shearin, No. 03-6952, 2004 WL 225093 (4th Cir. Feb. 6, 2004). Here, there was clearly "some" evidence to support the hearing officer's decision. Therefore, the Defendants are entitled to summary judgment with regard to Plaintiff's claim concerning the conduct and handling of his disciplinary hearing.

**VI.**

**(Loss or Destruction of Personal Property)**

Plaintiff also claims in his Complaint that his personal property was improperly confiscated in violation of prison policies regarding the disposition of inmate property. Plaintiff specifically complains that after he was placed in a strip cell following the incident of November 9, 2002, his personal property was not placed in a duffle bag nor was it inventoried and secured, as required by SCDC Policy 22.03. Plaintiff also alleges that he was not given the opportunity to

---

violation of a constitutional right]. If Plaintiff believes he has a claim due to a violation of some prison policy or administrative procedure, he should pursue that claim in an appropriate forum. See DeShaney v. Winnebago County Dep't of Social Servs., 489 U.S. 189, 200-203 (1989) [§ 1983 does not impose liability for violations of duties of care arising under state law]; Baker v. McClellan, 443 U.S. 137, 146 (1976) [§ 1983 claim does not lie for violation of state law duty of care].





oversee the removal of the personal property items from his cell, and that when he asked to be allowed to receive his legal documents/materials, he was simply told he would have to speak with Major Latta concerning this issue.

Plaintiff alleges that on November 10, 2002, prison guard Harold Scott brought a push cart containing a large brown cardboard box to his cell, and that he was told that the items which were removed from his cell had been placed inside the box. Plaintiff alleges this was not proper procedure under prison policy. Plaintiff alleges that he was "then allowed to have what little, undamaged legal documents/materials he could find, because upon both of our observations, most of the legal documents I was provided were either wet, mangled [ ] destroyed." Plaintiff's Complaint, p. 49. Plaintiff alleges that he was told by Officer Scott that he would be given the opportunity to personally go over the inventory of all of his personal and legal property on November 11, 2002 prior to the placing of his property inside of a duffle bag, but that this procedure never took place on November 11, and that he did not "receive any form of my personal/some legal property back in my possession until approximately 5 ½ days after the confiscation of said property." Id. Plaintiff further alleges that even following the return of his property, he was missing approximately thirty-seven (37) pictures of family members and loved ones, numerous personal letters and cards, two sets of religious prayer beads, some volumes of legal papers, and some religious and legal books. Plaintiff alleges he filed a grievance concerning the loss and/or destruction of this property, but that his grievance was denied on the grounds that there was "no credible evidence to support [his] allegations that the above items were in [his] possession...." Id, p. 51.





Defendants argue in their motion for summary judgment that Plaintiff's claims regarding the purported loss or destruction of his personal property fail to state a constitutional deprivation, and should therefore be dismissed. The undersigned is constrained to agree. After careful review of the materials submitted to the Court and the arguments from the parties, the undersigned fails to find any violation of Plaintiff's constitutional rights such as to allow him to maintain a claim under § 1983. Even if this Court assumes Plaintiff's allegation that his personal property was lost or mishandled by correctional officers to be true, such conduct does not amount to a constitutional claim, as he has available state court remedies to pursue this claim. See S.C.Code Ann. § 15-69-10, et. seq.. Because South Carolina has an adequate post-deprivation remedy for an alleged deprivation of property, Plaintiff's due process rights were not violated, even if it is assumed a correctional officer lost or mishandled his personal property. Hudson v. Palmer, 468 U.S. 517-518 (1984); McIntyre v. Portee, 784 F.2d 566-567 (4th Cir. 1986); see also Ricci v. Paolino, No. 91-1994, 1992 WL 63521 at **2 - **3 (1st Cir. April 1992). *Cf.* Longmoor v. Nilsen, 329 F.Supp.2d 289 (D.Conn. July 23, 2004) ; Bigbee v. United States, 359 F.Supp.2d 806, 809-810 (W.D.Wis. Mar. 15, 2005).

Although prisoners may pursue property deprivation claims against state officials under 42 U.S.C. § 1983 under some circumstances, such as where the deprivation is pursuant to an official policy, such is not the case under the facts presented here. There is no allegation, nor any evidence to show, that any prison policy allowed correctional officers to mishandle Plaintiff's personal property. In fact, Plaintiff specifically alleges that the Defendants' handling of his property *did not* follow prison policies and procedures. See Lawrence v. Swanson Inmate Commissary Services, No. 97-6429, 1998 WL 322671 (4th Cir. June 4, 1998) [deprivation claims as a result of





negligence fail to set forth a claim of constitutional magnitude]; *cf.* Davidson v. Cannon, 474 U.S. 344, 347 (1986); Daniels v. Williams, 474 U.S. 327, 331 (1986). This claim is without merit and should be dismissed. Wagner v. Higgins, 754 F.2d 186, 192 (6th Cir. 1985) [since plaintiff had a state law claim, there was no § 1983 claim where property allegedly retained as evidence was allegedly lost]; Marsh v. Land, No. 03-5977, 2004 WL 2442088 at *7 (E.D.Pa. Oct. 27, 2004) [Plaintiff could not proceed under § 1983, where she had an adequate state law remedy for seized property that had been destroyed]; Meyer v. Miro, No. 01-4260, 2003 WL 23198856 (D.S.C. 2003), (citing Yates v. Jamison, 782 F.2d 1182 (4th Cir. 1986)).

**VII.**

**(Other Claims Relating to General Conditions of Plaintiff's Confinement)**

The remainder of Plaintiff's federal claims can essentially be described as a hodge podge of various grievances, disagreements, and disputes with prison officials about the general conditions of his confinement, their conduct towards him, and other matters. Plaintiff complains about being required to wear shackles anytime he is out of his cell, including during visitations, and complains that the shackles cut off his circulation and cause cramps and muscle atrophy. Plaintiff also complains about being placed in the restraint chair during his haircut of August 13, 2003, and about being in a "strip cell" following the incident of November 29, 2002. Plaintiff complains that the ventilation in his cell is poor because the windows in the MSU cells are "sealed permanently", that he is entitled to "fresh air", and that the absence of "open windows" causes the inmates to breathe recirculated air which can lead to the transmission of airborne diseases.

Plaintiff complains that his drinking water is contaminated and dirty, causing his skin to be dry and resulting in rashes. Plaintiff alleges that when he filed a grievance with respect to this





complaint, he received a response that the water at KCI was not contaminated and was suitable to drink, and that the Department therefore considered the matter closed. Plaintiff also complains that the food is substandard, and is not sufficient to sustain inmates' health and well being. Plaintiff specifically complains that the amount of food being served is being decreased to the point that it is inadequate, and that this improper food service has caused him significant health problems, such as significant weight loss,[15] malnutrition, and bone deterioration. Plaintiff also complains that his food is often cold, and contains foreign materials such as dirt and hair, noting that prison guards do not wear any form of sanitary covering when they are delivering food. Plaintiff alleges that SCDC policy requires a food service supervisor/specialist to be present in the Maximum Security Unit during the serving of meals, but that this procedure is not being followed.

Plaintiff alleges that he has no means with which to determine what time it is or the date, and that he has a constitutional right to have a watch and/or be provided with a calendar or clock inside his isolation cell. Plaintiff also alleges he is entitled to have a mirror for "proper grooming", but that there are no mirrors installed inside the maximum security cells.

While these complaints clearly indicate Plaintiff's dissatisfaction with being an inmate in the MSU/SMU, there is no evidence that any of these conditions rise to a constitutional magnitude. In order to establish an Eighth Amendment violation of cruel and unusual punishment, Plaintiff must show both that he has suffered a serious deprivation of a basic human need, and that the Defendant prison officials showed a deliberate indifference with regard to the cited prison

---

[15]With respect to this particular claim, the undersigned can't help but note that the videotapes of the incidents involving the Plaintiff of November 2002 and August 2003 appear to reflect that Plaintiff had *gained* a substantial amount of weight between these two incidents.





conditions. Strickler, 989 F.2d at 1379; see Wilson v. Seiter, 501 U.S. 294 (1991). In a prison setting, the Fourth Circuit has held that

> ...the constitutional prohibition against the infliction of cruel and unusual punishment "does not mandate comfortable prisons, and only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." Indeed, the ordinary discomfort accompanying prison life is part and parcel of the punishment those individuals convicted of criminal offenses endure as recompense for their criminal activity. Accordingly, only extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim.

Shakka v. Smith, 71 F.3d 162, 166 (4th Cir. 1995).

Defendants assert that the Plaintiff has failed to show the necessary extreme deprivation in this case, and the undersigned agrees.

McKie attests that, due to security concerns, all inmates in Maximum Security are required to be shackled anytime they are outside of their cells. With regard to ventilation, McKie attests that the ventilation system in KCI functions within normal parameters, and that allowing inmates to control the ventilation system or to be able to open windows in the facility presents serious safety and operational concerns. McKie attests that inmates of the facility have already demonstrated that they are able to open the existing sealed windows and exit their cells onto the roof of the facility, which has required those windows to be permanently sealed shut. McKie attests that allowing inmates to open and close functional windows would obviously significantly reduce the security of the facility and likely result in additional escape attempts. McKie also attests that the facility is built with a centralized ventilation system for air conditioning and heating of the entire facility, that this system maintains a constant temperature which reduces utilities consumptions and provides a predictable environment for inmates, and that allowing an inmate to control this system





would create conflicts among inmates and would likely result in additional security concerns, including fights, extortion, and bribery among the inmates. While Plaintiff has submitted affidavits from several inmates complaining about the ventilation system and quality of the air; see Plaintiff's Exhibits (Court Document No. 235-2, pp. 8, 12, 17, 20, 25 and 29); these general and conclusory comments are merely opinions, and do not constitute evidence that the air in the prison does not meet constitutional standards. Ford v. Mercer County Correctional Center, 171 Fed.appx. 416, 421 (3rd Cir. 2006) [no constitutional violation based on plaintiff's complaints regarding air quality where although plaintiff submitted affidavits, plaintiff did not submit type of evidence upon which a jury could reasonably return a verdict in his favor.]; Flaherty v. Cunningham, No. 93-216, 1994 WL 485751 at *1 (D.N.H. Sept. 2, 1994) [Dismissing claim of poor air quality where inmates did not produce evidence of a sufficiently extreme deprivation].

As for the installation of mirrors, McKie attests that inmates routinely use mirrors and other reflective items to communicate among themselves and to observe the activities and routines of corrections officers. McKie attests that mirrors have been used in the past to allow inmates to act as look-outs for other inmates in an attempt to avoid detection of escape attempts and other prohibited activities, while inmates have also used mirrors and other metallic objects to fashion various implements, including weapons, used to assault staff and other inmates. McKie also attests that there would be a substantial cost associated with the installation of mirrors, as well as the monitoring, maintenance, and repair of these items. Similarly, the installation of clocks in cells would result in a substantial expense, both for installation and for maintenance and repair. McKie attests that the installation of clocks within cells would also create substantial security concerns, since inmates can and have used clocks and other time keeping devices to monitor the activities of





correction's staff and develop escape plans based on the timing of guard activities. Inmates have also used such ordinary instruments to fashion various contraband items, including weapons and tools to unlock restraint devices.

With respect to Plaintiff's complaints about the water supply, McKie attests that the water in the Maximum Security Unit is provided by the City of Columbia as part of their city wide distribution of potable water, and that the water supply for the facility is routinely inspected and tested by the City of Columbia and is in full compliance with City standards. McKie attests that there is no indication that the potable water supply in the Maximum Security Unit has any problems or contamination. While Plaintiff has submitted affidavits from various prisoners complaining about the water quality; see generally, Plaintiff's Exhibit (Court Document No. 235-2, pp. 8, 13, 20, 25 and 29); the comments contained in these affidavits are again only personal statements by these inmates that they do not like the water. They are not evidence that there is anything wrong with or unsanitary about the water. Such general and conclusory statements are not sufficient to maintain a constitutional claim. Ford, 171 Fed.appx. at 421 [no constitutional violation based on plaintiff's complaints regarding water quality where although plaintiff submitted affidavits, plaintiff did not submit type of evidence upon which a jury could reasonably return a verdict in his favor.]

The same is true regarding the food service. See Plaintiff's Exhibit (Court Document No. 235-2, pp. 20-21, 25, 29, 45-47, 52-67). Plaintiff has submitted affidavits from prisoners complaining about the food service, the portions served, that the food is oftentimes cold, that they believe the food is sometimes spoiled, and various other complaints. One prisoner even complains he contracted salmonella from his food. However, many people outside of prison also contract salmonella on occasion. It is a fact of everyday life. That does not mean that a constitutional





violation has occurred, nor do any of these inmates' other general and conclusory complaints about the food quality in the prison rise to the level of *evidence* of a constitutional violation. McKie attests that inmate meals are prepared by the food services division and inspected by the South Carolina Department of Health and Environmental Control. McKie attests that these meals are prepared at the direction of a licenced dietician and comply with the nutritional standards applicable to the Plaintiff, that meal preparation is supervised by correction staff and the meals are then immediately transported to the facility for distribution on dedicated meal carts, and that there is no indication that there have been any problems with the food preparation facilities. See generally, McKie Affidavit. Plaintiff has provided no evidence to dispute or call into question McKie's assertions, or to show that the quality of food falls below constitutional standards. See Papasan v. Allain, 478 U.S. 265, 286 (1986) [Courts need not assume the truth of legal conclusions couched as factual allegations.]; House v. New Castle County, 824 F.Supp. 477, 485 (D.Md. 1993) [Plaintiff's conclusory allegations insufficient to maintain claim]; *cf.* Flaherty, 1994 WL 48575, at *1.

After careful review and consideration of Plaintiff's claims and the other evidence, the undersigned finds and concludes that Plaintiff's general and conclusory complaints of constitutional violations, without any specific evidence of deprivations sufficient to demonstrate a claim of a constitutional magnitude, are simply insufficient to survive summary judgment. "In the context of a conditions-of-confinement claim, to demonstrate that a deprivation is extreme enough to satisfy the objective component of an Eighth Amendment claim, a prisoner must 'produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions,' or demonstrate a substantial risk of such serious harm resulting from the prisoner's





unwilling exposure to the challenged conditions." Shakka, 71 F.3d at 166; Strickler, 989 F.2d at 1381. Plaintiff has failed to do so.

During the time period set forth in the Complaint, Plaintiff was an inmate in the Maximum Security Unit of a state correctional facility, not a hotel. It should be expected that conditions in such a setting are oftentimes less than ideal. Lunsford v. Bennett, 17 F.3d 1574, 1581 (7th Cir. 1994); Hadley v. Peters, No. 94-1207, 1995 WL 675990 * 8 (7th Cir. 1995), cert. denied, 116 S.Ct. 1333 (1996) ["prisons are not required to provide and prisoners cannot expect the services of a good hotel."] (quoting Harris v. Fleming, 839 F.2d 1232, 1235 (7th Cir. 1988)). As noted, only those deprivations denying "the minimal civilized measure of life's necessities" rise to the level of a constitutional violation; Wilson v Seiter, 501 U.S. at 298; and nothing in the evidence presented to the Court shows that the Plaintiff was denied such minimal necessities, or that the Defendants took the actions they did "for the very purpose of causing harm or with the knowledge that harm [would] result." Farmer, 114 S.Ct. at 1978-1979. Plaintiff's allegations concerning these matters, as well as his inmate affidavits, are so general and conclusory, and otherwise lacking in evidentiary support, that they simply fail to set forth a viable constitutional claim. Such general and conclusory allegations by the Plaintiff that he is being held in unconstitutional conditions of confinement and that he has suffered harm from these conditions, standing alone, are not sufficient to avoid summary judgment. Cochran v. Morris, 73 F.3d 1310, 1317 (4th Cir. 1996); White v. Boyle, 538 F.2d 1077, 1079-1080 (4th Cir. 1976); Salahuddin v. Jones, 992 F.2d 447, 449 (2d Cir. 1993), cert. denied, 510 U.S. 902 (1993); Proffitt v. United States, 758 F.Supp. 342 (E.D.Va. 1990); Magee v. Waters, 810 F.2d 451, 452 (4th Cir. 1987) ["Courts have required a showing by a complaining prisoner of actual injury or specific harm to him before a claim of lack of access to the courts will be sustained"];





Hause v. Vaught, 993 F.2d 1079, 1084-1085 (4th Cir. 1993); Cochran v. Morris, 73 F.3d 1310, 1317 (4th Cir. 1996) [Dismissal of access to court claim proper where inmate relied on conclusory allegations and failed to identify any actual injury].

As for Plaintiff's security complaints, extensive caselaw exists upholding the Department's policies with respect to shackling and other forms of restraints. Specifically addressing the need for physical restraints while Plaintiff is outside of his cell, the restraint policy at issue has previously been upheld both by this Court, and by the Fourth Circuit Court of Appeals. See Caprood v. Moore, C/A No. 98-603 (D.S.C. May 27, 1999), aff'd No. 99-6792, 1999 WL 651848 (4th Cir. Aug. 26, 1999) (table); Zulu X v. Catoe, C/A No. 4:94-1898-3BE. See also Chavis v. Fairman, No. 94-1503, 1995 WL 156599 at * 5-6 (7th Cir. Apr. 6, 1995) ["Generally, even dramatic restrictions on outdoor exercise do not violate [the due process clause] so long as prisoners have ample opportunity to enjoy indoor activity"]. Use of "blackbox" restraints has also been upheld by the Courts. See Fulford v. King, 692 F.2d 11 (5th Cir. 1982); Knox v. McGinnis, 998 F.2d 1405 (7th Cir. 1993) [qualified immunity]; Moody v. Proctor, 986 F.2d 239 (8th Cir. 1993); Morissette v. Godinez, No. 94-1475, 1996 WL 681378 (7th Cir. Nov. 19, 1996); McLaurin v. Hofbauer, No. 93-1628, 1993 WL 473694 (6th Cir. Nov. 15, 1993). As for Plaintiff's placement in the restraint chair on August 13, 2003 during the period he was having his haircut, the use of devices such as restraint chairs or four-point bed restraints have repeatedly been found to be constitutional when used appropriately, and there is no evidence before the Court to show that in this instance, Plaintiff was kept in the restraint chair for an excessive period of time, or that Plaintiff suffered any injuries as a result of his placement in the restraint chair. Fuentes v. Wagner, 206 F.3d 335, 345-346 (3d Cir. 2000), cert. denied, 531 U.S. 821 (2000); *cf.* Williams v. Burton, 943 F.2d 1572 (11th Cir. 1991) [Eighth





Amendment not violated when inmate kept in four-point restraints for 28 ½ hours after inmate cursed, threatened to kill officers and spat on them, threw bodily fluids at them, creating a disturbance in the prison.]; Green v. McCurry, No. 02-4326, 2003 WL 21826549 (N.D.Ill. Aug. 5, 2003). Therefore, use of the restraint chair was not unconstitutional in Plaintiff's case given the documented disruptive and belligerent behavior exhibited by the Plaintiff over an extended period of time.

As for the remainder of Plaintiff claims, he has presented neither sufficient factual allegations nor evidence to proceed with these claims past summary judgment. Just because Plaintiff has filed numerous grievances concerning these matters does not mean that his constitutional rights were being violated. *Cf.* Lopez v. Robinson, 914 F.2d 486, 490-491 (4th Cir. 1990) [Plaintiff's allegations that the ventilation system at the prison was deficient, defective, and otherwise incapable of providing adequate airflow within the individual cells did not give rise to a cognizable Eighth Amendment claim where the allegations were conclusory and there was no specific evidence of any unnecessary and wanton infliction of pain resulting in serious medical and emotional harm to the plaintiffs]; Ford, 171 Fed.Appx. at 421; Flaherty, 1994 WL 485751, at *1; Calhoun v. Wagner, Nos. 93-4075, 93-4122, 1997 WL 400043 at *4 (E.D.Pa. July 14, 1997) [Temporary water shut-off did not give rise to a constitutional violation because of the legitimate purpose behind the action and the short duration of the alleged deprivation]; Kidwell v. Buchanan, No. 93-15056, 1993 WL 230224 at **1 (9th Cir. June 29, 1993) [Where temporary restriction of amenities was found not to be cruel and unusual punishment]; see generally, Sandin v. Conner, 515 U.S. 472 (1995); See also Rish v. Johnson, 131 F.3d 1092, 1096 (4th Cir. 1997) ["only extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim regarding conditions of confinement"];





Harris v. Fleming, 839 F.2d at 1235 [prisoner deprived of toilet paper, soap, toothpaste and toothbrush while kept in filthy, roach infested cell suffered no punishment when no physical harm resulted]; Isaac v. Fairman, No. 92-3875, 1994 WL 63219, * 5-6 (N.D.Ill. 1994) [allegation that prisoner was provided only one uniform and denied adequate opportunity to wash did not state claim]; Michenfelder v. Sumner, 860 F.2d 328, 332-333 (9th Cir. 1988) [strip searches when entering and leaving cells not excessive even if prisoner escorted from one portion of the unit to the next]; Maberry v. McKune, 24 F.Supp.2d 1222, 1228-1229 (D.Kan. 1998) [regulation which imposed quantity and value limitations on property which inmates were allowed to possess did not violate equal protection of due process]; Savko v. Rollins, 749 F.Supp. 1403, 1409 (D.Md. 1990) [limitation on the amount of in-cell religious reading material contained in prison regulation is constitutional under Turner standards]; Jeffries v. Reed, 631 F.Supp. 1212, 1219 (E.D.Wash. 1986) [The denial of a mirror does not rise to the level of an Eighth Amendment violation].

As has been the case with several of Plaintiff's other claims, Plaintiff may or may not have a cause of action with respect to his general conditions of confinement under some state law, policy or procedure. However, the only issue before this Court is whether Plaintiff has submitted sufficient evidence to give rise to a genuine issue of fact as to whether his complaints rise to the level of a *constitutional* violation. He has failed to present such evidence, and these claims should therefore be dismissed. See DeShaney, 489 U.S. at 200-203 [§ 1983 does not impose liability for violations of duties of care arising under state law]; Baker, 443 U.S. at 146 [§ 1983 claim does not lie for violation of state law duty of care].





## VIII.

## (State Law Claims)

Finally, Plaintiff has also cited numerous state statutes and/or other common law state law claims, including defamation, as claims being asserted in this lawsuit. Defendants correctly note that any such state law claims must be pursued in state court under the South Carolina Tort Claims Act, which establishes the South Carolina Court of Common Pleas where the purported tort occurred as the sole court with jurisdiction over such state law claims against governmental entities or their employees. See S.C.Code Ann. § 15-78-100(b) ["Jurisdiction for any action brought under this chapter is in the circuit court and brought in the county in which the act or omission occurred"]. Defendants also further note that by enacting this law and allowing individuals to pursue tort claims against state officials, the state of South Carolina specifically preserved its Eleventh Amendment immunity from suit in federal court. See S.C.Code Ann. § 15-78-20(e).

In any event, under the applicable caselaw, when federal claims presented in a case are dismissed, any remaining state law claims should be dismissed, without prejudice, for resolution in state court under the general doctrine developed in United Mine Workers v. Gibbs, 383 U.S. 715 (1966). See In Re Conklin, 946 F.2d 306, 324 (4th Cir. 1991); Nicol v. Imagematrix, Inc., 767 F.Supp. 744, 746, 749 (E.D.Va. 1991); Mills v. Leath, 709 F.Supp. 671, 675-676 (D.S.C. 1988); Carnegie-Melon v. Cohill, 484 U.S. 343 (1988); Taylor v. Waters, 81 F.3d 429, 437 (4th Cir. 1996). Additionally, if summary judgment on these claims were to be denied, it would be much more appropriate for these claims to be tried by the state courts. See also Jinks v. Richland county, 538 U.S. 456 (2003) [State statute of limitations tolled for state claims in federal lawsuit dismissed without prejudice].





**Conclusion**

Based on the foregoing, it is recommended that the Defendants' motion for summary judgment be **granted**, and that this case be **dismissed.** Plaintiff's state law claims should be **dismissed**, without prejudice, so that he may purse these claims in state court, if he so chooses.

The parties are referred to the Notice Page attached hereto.

Bristow Marchant
United States Magistrate Judge

Columbia, South Carolina

January 24, 2007





**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Court Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. In the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must "only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005).

Specific written objections must be filed within ten (10) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). The time calculation of this ten-day period excludes weekends and holidays and provides for an additional three (3) days for filing by mail. Fed. R. Civ. P. 6(a) & (e). Filing by mail pursuant to Fed. R. Civ. P. 5 may be accomplished by mailing objections to:

Larry W. Propes, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985).



